# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **DAVID MEYERS,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:19cv250** |
| | ) | |
| **v.** | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **T.W. HALL,** *et al.*, | ) | **By: Joel C. Hoppe** |
| **Defendants.** | ) | **United States Magistrate Judge** |

| | | |
|---|---|---|
| **DAVID MEYERS,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:19-cv-406** |
| | ) | **Civil Action No. 7:19-cv-496** |
| | ) | **Civil Action No. 7:19-cv-558** |
| **v.** | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **CARL MANIS,** *et al.*,[1] | ) | |
| **Defendants.** | ) | **By: Joel C. Hoppe** |
| | ) | **United States Magistrate Judge** |

| | | |
|---|---|---|
| **DAVID MEYERS,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:19cv605** |
| | ) | |
| **v.** | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| **J. ELY,** *et al.*, | ) | **By: Joel C. Hoppe** |
| **Defendants.** | ) | **United States Magistrate Judge** |

These five cases have been referred to me for proceedings as necessary and a report and recommendation concerning whether plaintiff David Meyers was under imminent danger of serious physical injury when he filed these actions. In these cases, Meyers asserts overlapping and sometimes duplicative claims pursuant to 42 U.S.C. § 1983, against dozens of defendants, mostly Virginia Department of Corrections ("VDOC") staff. His complaints reference incidents

---

[1] Manis is the first named defendant in each of these three cases; the other defendants are not identical across all three cases.

that occurred at other prisons and at Wallens Ridge State Prison ("WRSP"), where he was
housed on the dates he filed all five lawsuits.

As noted by the presiding judge in his referral order, Meyers is a three-striker under 28
U.S.C. § 1915(g), having had at least three cases dismissed as frivolous before each of these
cases was filed.  (*See* No. 7:19-cv-250, Dkt. No. 9 at 2–3 (setting forth those cases).)
Accordingly, Meyers cannot proceed with this action unless he prepays the filing fee or
demonstrates that he is under "imminent danger of serious physical injury."  28 U.S.C.
§ 1915(g).  Meyers has not prepaid the filing fee and, thus, the threshold inquiry in each case is
whether he is under imminent danger of serious physical injury, so as to allow the lawsuit to
proceed.  On December 19 and 20, 2019, I held a consolidated evidentiary hearing in all five
cases on that issue.  Although none of the defendants have yet been served, Virginia's Office of
the Attorney General ("OAG"), who would presumably represent the VDOC defendants,
appeared and contested Meyers's assertion that he is in imminent danger of serious physical
injury.[2]

For the reasons set forth below, I conclude that Meyers has not shown that he is under
"imminent danger of serious physical injury."  Accordingly, I recommend that the district court
find that Meyers is not entitled to proceed *in forma pauperis* in any of these actions, dismiss all
five actions, and dismiss all pending motions as moot.

## I.    BACKGROUND

### A.  Dates of Complaints

Meyers testified that he placed his complaints in the prison mail the date they were
signed.  Using the dates that Meyers signed the complaints—although those dates are not always

---

[2] Although these attorneys have not yet entered an appearance on behalf of any defendants, for ease of
reference, I refer herein to evidence presented and arguments made by those attorneys as being by "defendants."

consistent with the postmarked dates on his envelopes—the filing date for each complaint is as follows:

- Case No. 7:19cv406  (February 23, 2019)
- Case No. 7:19cv250  (March 21, 2019)
- Case No. 7:19cv496  (June 15, 2019)
- Case No. 7:19cv558  (July 10, 2019)
- Case No. 7:19cv605  (August 28, 2019)

To proceed on any of these lawsuits, then, Meyers must show that he was in imminent danger of serious physical injury at some point between February 23, 2019 and August 28, 2019.

It is worth noting at the outset that Meyers testified that he was transferred from Red Onion State Prison ("ROSP") to WRSP in November 2018, and he was housed at WRSP at the time he filed each of these lawsuits. This information about the place of his incarceration is also consistent with Meyers's sworn testimony at evidentiary hearings held before another judge of this court in December 2018 and February 2019.[3]  Thus, allegations related to occurrences at ROSP are irrelevant to the determination of whether Meyers was in imminent danger of serious physical injury for purposes of these lawsuits. Meyers attempted to connect occurrences at the two prisons, and offered his own testimony that certain officers at ROSP are relatives of WRSP officers and are working in concert to harm him. He also elicited testimony from several witnesses about relatives being employed at those prisons. But (as discussed below), there was no competent evidence to suggest that any action taken by anyone at WRSP resulted from such relationship, only wild speculation on Meyers's part. Thus, I do not consider anything that

---

[3]  In separate cases filed by Meyers in 2018, United States Magistrate Judge Pamela M. Sargent held two evidentiary hearings and issued a lengthy report and recommendation, recommending that the district judge conclude Meyers had not shown he was in imminent danger of serious physical injury. (Case No. 7:18cv485, Dkt. No. 109.)  That report repeatedly referenced Meyers's lack of credibility and explained how some of his testimony was either inherently contradictory or contradicted by more credible record evidence. The report was adopted by the presiding district judge.

happened at ROSP to be relevant to Meyers's claims of imminent harm in 2019.

**B. Allegations of Imminent Harm**

Meyers's claims in each complaint are discussed in the presiding judge's memorandum opinion accompanying the order referring these cases to me, and I will not repeat those claims here.[4]  (No. 7:19-cv-250, Dkt. No. 9 at 5–13.)  For purposes of this opinion, I will simply focus on his allegations that he is in imminent danger of serious physical harm.  Grouping like allegations together, his claims of imminent harm are as follows:[5]

1.  Certain defendants tried to incite "hundreds" of inmates to murder him by giving them unsealed copies of his civil actions in which he identifies himself as an FBI informant.  Also, WRSP employees are trying to murder him and "unceasing[ly]" threatening to murder him, including specific death threats by prison guards on certain dates in 2019.

2.  Identified individuals and gang members, as well as unidentified inmates at WRSP, are trying to murder him.

3.  He alleges, in general terms, "unceasing PREA retaliation, sexual abuses, sexual assaults, sexual violence, [and] attempted murders on him," since he arrived at WRSP on November 20, 2018.

4.  Defendants tried to force him into general population on March 6, 2019, when he was supposed to be in "protective custody."  Meyers attempted to file an emergency grievance challenging the order to go to general population, but officers refused to sign it. Nonetheless, he remained in restricted housing.

5.  Various defendants took actions on various dates (such as giving him incorrect eyeglasses or placing materials in the middle of his cell after a cell search), that caused him to fall and hit his head.  Thereafter, prison nurses refused to treat his head

---

[4]  The Fourth Circuit recently has clarified, in appeals filed by Meyers, that "the allegations of imminent danger in [an] IFP application must have some nexus or relation to those of the underlying complaint."  *Meyers v. Comm'r of Social Sec. Admin,* No. 18-2312, __ F. App'x __, 2020 WL 429706, at *5 (4th Cir. Jan. 28, 2020). Meyers's complaints contain overlapping factual allegations and claims and many contain allegations of past harms, but I will assume, without deciding, that the allegations of imminent danger in each are sufficiently related to at least some of the allegations in each underlying complaint so as to satisfy that standard.

[5]  I do not include allegations that do not relate to possible physical injury, such as his claim that his funds are being embezzled or that his legal papers were taken or destroyed.  As noted, I also do not treat or discuss allegations of harm that occurred while Meyers was housed at ROSP.  Those allegations include alleged assaults by a ROSP correctional officer where Meyers was hit by milk bags or other objects in his testicles and alleged "assaults" by inmate Thompson in 2018.  According to Meyers, Thompson threatened him, masturbated in front of him, and later threw urine and feces on Meyers through a shared vent in their adjoining cells.

injury, causing him "severe pain."  The falls were more likely to occur because Meyers's walker was taken from him when he transferred to WRSP and has not been returned.  Meyers used the walker to assist him in moving about his cell or transferring from his wheelchair to the toilet.

6.  He has been forced to eat, drink, and ingest hazardous toxic paint mixed with mold, e-coli, and cobalt.

7.  Unknown WRSP kitchen inmates or others or other inmates or staff are putting oven cleaner, glass, or other hazardous substances in his food to try to kill him.

8.  He was not permitted to shower or attend outside recreation for 477 days, which caused his bedsores to worsen.

9.  Unsafe and insecure chairs have been installed in D-2 pod, and defendants purposefully installed them "to torture [him]" and cause prisoners to break their necks.

10.  On August 27, 2019, a group of defendant guards pumped gas into his cell to kill him and have attempted to kill fellow inmate Christopher Dammones, who Meyers says witnessed the defendants "murder[ing]" inmate Luther Early on August 11, 2019.[6]  As to Meyers, defendants then refused to extract him so he could be decontaminated.

11.  Defendant D. Harris cut Meyers's left arm on May 31, 2019, as he was delivering legal mail to Meyers.

12.  Medical personnel have repeatedly failed to treat him for his head injuries, severe chest pains, ribs, shoulders, testicles, nine gunshot wounds, stomach cancer, poisonings, and bedsores.  Additionally, one doctor also prescribed Meyers a medication that he contends was a narcotic without permission and perhaps another medicine that Meyers says he was allergic to.

**C.  Testimony and Evidence from the Hearing**

In addition to Meyers, who testified at length at the hearing, I also heard testimony from the following three inmate witnesses called by Meyers: Christopher Dammones, Bobby Alan Richardson, and Linwood Mathias.  Defendants called witnesses Joseph Ely, David Harris, Benjamin Young, Tina Townsend, and Dr. Mullins.  Pertinent parts of the testimony follow.

---

[6]  Luther Early apparently died on August 11, 2019, while housed in the D-2 pod.  According to Meyers, certain defendants failed to render aid or call for emergency medical services for Early even though he was unresponsive in his cell.

### 1. Meyers' testimony

#### a. *Claims 1 through 3: Threats by inmates and staff*

Meyers's testimony began with a broad overview of his allegations.  Overall, Meyers's allegations reflect his belief that there is a vast and far-reaching conspiracy to kill him involving OAG counsel, ROSP and WRSP correctional officers, other staff, and medical personnel.  He also believes that many inmates, both at ROSP and WRSP, from different gangs and for different reasons, want to murder him.[7]

With regard to the inmates who want him dead, Meyers testified about assisting the Chesterfield Commonwealth's Attorney in prosecuting an individual that Meyers says is a captain in the Mexican Mafia gang.[8]  The Mexican Mafia gang, which has a number of members at WRSP, has decreed to kill him as a result.  Meyers admitted that he has not had any direct physical contact with anyone from the Mexican Mafia while at WRSP.  He asserts, though, that on January 29, 2019, he received a lunch tray with crushed glass in it and he believed the glass was purposefully put in his meal tray by an unspecified Mexican Mafia member who worked in the kitchen and was trying to kill him.

He claims that another inmate has a $50,000 reward for anyone who kills him and that a different "crime family," called "the Henderson, Mays, Reeves, and Casey crime family," had him attacked by inmate Mullins, who is a member of the Gangsta Disciples gang.  (Day 1 Tr. at 152, 155–56, Case No. 7:19-cv-250, Dkt. No. 53.)  During that attack, he was stabbed in his eye and hit with a combination lock in his eye.  Meyers did not specify the date of that attack, but it

---

[7]  Many of his complaints also included allegations that judges of this court are involved in the conspiracy, but the presiding judge previously dismissed the judicial defendants.  In any event, Meyers did not focus on the judges at all in presenting his claims of imminent harm at the hearing.

[8]  Although some of his complaints refer to him being an FBI informant, he did not reference that topic at the hearing nor did he specify when or how he assisted the FBI.

occurred at some point prior to January 2017, long before his transfer to WRSP. (Day 1 Tr. at 156.) Meyers also testified that, when he first moved to WRSP, he began getting death threats from the former occupant of his cell, who believed he had left property in the cell that Meyers had. That inmate and others associated with him started making death threats to Meyers at that time. Additionally, his papers allege that defendants purposefully informed other inmates about his cooperation with law enforcement and made known that he was a "PC [protective custody] snitch" or "PC rat." (*See* Day 1 Tr. at 186.)

Meyers asserts that his transfer to WRSP on November 20, 2018, was a "retaliation transfer" caused by opposing counsel in prior litigation, two OAG attorneys. (Day 1 Tr. at 144, 165.) He claimed that one of those lawyers also directed two correctional officers to file a false disciplinary action against Meyers about his refusing to return to the protective custody unit. Meyers testified that the attorney who sent him to ROSP "knew he was setting [Meyers] up [and] sending [him] to a swamp full of alligators that [would] finish [him] off." (Day 1 Tr. at 166.)

His fears of harm appear to extend to just about every staff member and inmate at WRSP, and he made similar allegations against numerous staff members and inmates at ROSP when housed there. Typical statements from his testimony were: "It's the whole staff there, . . . trying—basically marshaling the inmates there to murder me, to keep making death threats to me"; and "The whole compound was making death threats to me." (Day 1 Tr. at 153–54, 186.) Meyers alleged that unspecified prison guards were "marshaling inmates" to murder him, that "the defendants intentionally sent [him] to [WRSP] to be murdered . . . and subject to retaliation." (Day 1 Tr. at 153; Day 2 Tr. at 41, Case No. 7:19-cv-250, Dkt. No. 54.) He alleged that defendants were "marshaling employees to sexually abuse . . . and murder" him. (Day 1 Tr. at 170.) He also claimed that there is an "unorthodox terrorist cult militia . . . using the state

7

prisons in the Western District to do all their dirty work and racketeering and do everything, kill inmates." (Day 1 Tr. at 177.) He also referenced, in comments to the court during questioning of another witness, that an "unorthodox terrorist militia prison gang within the prison" was being facilitated and managed by the OAG attorneys. (Day 1 Tr. at 49–50.)

In addition to his generalized statements about threats and "unceasing" assaults and attacks, Meyers identified by name some specific inmates at WRSP that threatened him at different points. But he also admitted during his testimony that he has not been assaulted by any inmate while housed at WRSP. Moreover, he admitted that his assignment in restricted housing while at WRSP has meant that he has had no physical contact with other inmates at all.

Meyers identified, though, two incidents in which he believes he could have been hurt by another inmate, although he was not. He also alleges that he has been threatened by the inmate worker in D-2 pod, Teddy Strouth, and that Strouth has the ability to hurt Meyers.

As to the first incident, Meyers was leaving the medical unit and he crossed paths with another offender, Lytton, who was being released to general population and who wants to kill Meyers. Meyers testified that the guards were "trying to arrange the right type of stabbing." (Day 1 Tr. at 204.) He claimed that Lytton and another inmate, who were not wearing handcuffs, held a door for him and passed him, and Lytton was close enough to kill him. Lytton did not touch him or say anything to him, however; he simply gave Meyers an "intimidating look." (Day 1 Tr. at 207–08.)

The second exposure to an inmate occurred while Meyers's cell was being "ransack[ed]" by guards on November 1, 2019. (Day 2 Tr. at 24.) At that time, Meyers was removed from his cell and was being held in the D-2 pod, supervised by officers and restrained. At the same time, another offender who wants to kill Meyers, Shoemaker, was also having his cell searched and so

8

was also out of his cell and in the same pod.  Shoemaker was handcuffed and Meyers testified

that there were officers around.  But Meyers alleged that none of the officers were near

Shoemaker and he believed that they were hoping Shoemaker would stab him.  Although nothing

occurred, Meyers suggested that the mere fact that this type of interaction occurred means there

is a possibility for another inmate to kill him, despite his being housed in a restrictive housing

unit.

Lastly, Meyers brought up that, beginning in late July 2019, the inmate pod worker in the

D-2 pod, Strouth, began threatening Meyers and telling him that he was going to firebomb his

cell.  Meyers stated that Strouth's access to the chemical closet in the pod, his ability to walk

around unrestrained while working, and his ability to unlock the cell tray slots could provide

Strouth the opportunity to firebomb Meyers's cell and set him on fire.  Meyers reported the

threats by Strouth, but nothing was done.

Meyers also testified as to numerous death threats made to him by specific guards on

specific dates, and he stated that he believed that the death threats had been sent from OAG

counsel and were "coming from" counsel.  (Da 1 Tr. at 239–40.)

As to assaults by staff, the only physical assaults he alleges are set forth in Claim 10,

alleging that a group of officers sprayed gas into his vent to try to kill him on August 27, 2019,

and Claim 11, alleging that he was cut on the arm by defendant Harris on May 31, 2019, both of

which are discussed below.

### b.  Claim 4: Threat by staff to move him to general population

I turn next to the facts surrounding Claim 4, in which Meyers asserts that defendants

threatened to move him to general population.  Meyers testified that, upon his arrival at WRSP,

he was housed in D-1 pod, a restricted housing unit, for approximately nine days.  In a restricted

housing unit, inmates are confined to single cells and do not take meals, shower, or have recreation with other inmates. Then he was assigned to Cell D-210 in the D-2 pod. D-2 pod is another restricted housing unit with the same rules, and inmates are again in single cells without cellmates. Meyers remained in the D-2 pod until shortly before the evidentiary hearing when he was transferred to another prison.

Meyers insisted that he was "court-ordered" to be in protective custody, (Day 1 Tr. at 145–46), but the document he relied upon for that assertion is not a court order and does not require his placement in protective custody.[9] Instead, it is a document filed in an earlier case by OAG counsel informing the court that Meyers was being transferred to protective custody. (Pl.'s Ex. 1; also docketed as Dkt. No. 25 in *Meyers v. Clarke*, No. 7:16-cv-573 (W.D. Va.).) That document refers to the court's January 27, 2017 order in the same case, and Meyers apparently relies on that order as saying that the court ordered that he be placed in protective custody. But a review of that order simply notes that the court had been told VDOC was transferring Meyers and the court directed that counsel "advise the court when the transfer" had been completed. (*See id.*) The order was issued in the context of addressing Meyers's request for injunctive relief, but the court did not reach the merits of that request.[10]

On March 6, 2019, Meyers alleges that certain defendants tried to force him to transfer to a general population pod so that inmates would kill him. But he refused to go and he admitted that he was never transferred to general population and was not removed from his cell in the

---

[9]  No one testified at the hearing about the differences between a protective custody unit and a restricted housing unit, but several witnesses stated that there is not protective custody housing at WRSP.

[10]  Meyers had requested an injunction in the form of being granted "Keep Separate" status from four persons and being transferred to protective custody. *Meyers v. Clarke*, No. 7:16-cv-573, Dkt. No. 19. The order explains that the OAG had provided evidence "that the four persons" had been added to Meyers's keep separate list and counsel had "informally advised the court that officials intend to transfer Meyers to another facility where he will be placed in protective custody." *Id.*

restricted housing unit.  Instead, Meyers testified that he was not required to leave the restricted
housing unit and was housed there until his transfer to another prison to attend the hearing in this
case.

Upon cross-examination, Meyers stated that he wants to be in protective custody, but not
around the many inmates that he believes should be on his keep-separate list.

> c.  *Claim 5: Acts by defendants to cause him head injuries; Claims 6 and 7:*
> *Defendants are housing him in a cell with peeling hazardous toxic paint, and he is*
> *being forced to eat, drink and ingest hazardous substances, including substances*
> *placed in his food by kitchen inmates or others*

Meyers uses a wheelchair, and he alleges that he is "blind."[11]  He wears glasses and
Meyers testified that, on several occasions, he either was denied his glasses or purposefully given
the wrong glasses, which caused him to fall in his cell and hit his head on either the toilet or the
sink.  On another occasion, officers ransacked his legal materials and left a large pile of materials
in the middle of his cell floor.  He claims that the pile of paperwork left his life in great harm.
He could not avoid them in his wheelchair and so his wheels slipped on the papers on the floor,
and he fell forward.  He claims that all of these falls resulted in significant head injuries, which
the medical staff refused to acknowledge or treat.

He also testified that he was housed in cell D-210 because "they knew the cell was laced
with the hazardous paint and the cobalt mixed with the E. coli." (Day 1 Tr. at 167–68.)
According to him, one of the guards accidentally let slip that he was being housed in the
"seizure cell." (Day 1 Tr. at 169.)  He testified that paint falls from the ceiling, getting in his
mouth and face, and that, in an average week, the amount that falls could fill a "whole bucket."

---

[11]  It is unclear whether Meyers is legally blind, but he can certainly see some things.  Although Meyers
wears glasses and the medical records reflect that he has some visual impairment, he was able to read from and find
documents throughout the entire two-day hearing, and he did not appear to be having any difficulty in finding them
in stacks of documents or reading them.

(Day 1 Tr. at 169.)

He also claimed that his food has been contaminated.  On one occasion, he found glass in his food.  He also testified that inmates, staff, or the D-2 pod worker, Teddy Strouth, placed oven cleaner or other substances in his food to poison him, although he never saw this being done.

Meyers also claimed that Officer Baker, a defendant, had made sexual and threatening remarks to him, and after Meyers requested and was refused a PREA telephone by several officers, Baker brought Meyers's lunch tray.  After the first few bites, Meyers's throat started burning, he started coughing, and when he tried to regurgitate it out of his throat, he began vomiting.  He said he was in severe pain, and he pushed his intercom button, but nobody helped him.  He believed that the navy beans had been sprayed with Oleoresin Capsicum ("OC") or pepper spray.[12]

        *d. Claim 8: He was not permitted to shower or go to recreation for 477 days; and Claim 9: Recreation chairs installed in D-2 pod are installed to "torture" and cause falls*

Meyers testified that he had been refused a shower and his daily hour of recreation the entire time he was housed at WRSP—a total of 477 days as of the date of the evidentiary hearing.  Even when he went to the medical unit, which occurred at least six times during that period, he was denied the opportunity to shower, and he was forced to wear the same boxers until they were "black."  (Day 1 Tr. at 195.)

His complaints allege that the recreation chairs installed in D-2 are designed to "torture" him, but it is not clear whether he was ever injured as a result of sitting in the chair.  He failed to elaborate on his claims concerning the chairs during the hearing, and it is unclear whether he has

---

[12] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose.  *See, e.g.*, *Park v. Shiflett*, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

actually ever sat in one.

> *e. Claim 10: Defendants pumped gas into his cell to try to kill him in August 2019*

Many of Meyers's complaints reference the "murder" of a fellow inmate, Luther Early. According to Meyers, Early was "murdered" by defendants on August 11, 2019, because he died after certain defendants failed to render aid or call for emergency medical services for Early. Meyers claimed that after he reported the "murder" to authorities, he and another witness to it, inmate Christopher Dammones, have been retaliated against, threatened, and poisoned.

On August 27, 2019, he claims that Dammones was nearly beaten to death by guards during a cell extraction. Thereafter, a number of the guards came back, and he thought they were going to beat him to death. Instead, one of them went inside the "chase closet," which Meyers described as a closet next to his cell that provides access to the vent in his cell.[13] (Day 1 Tr. at 225–26.) He heard someone say, "Meyers, suck on this," and he heard a burst of gas, which presumably was OC spray. (Day 1 Tr. at 226.) One of the guards sprayed the whole gas cannister until it was empty, causing the gas to travel through the vent to Meyers' cell. He then saw the guards laughing and high-fiving as they left the pod. According to Meyers, he reported the incident, and defendant Anderson, who was either a major or assistant warden, came to Meyers's cell and smelled the gas, but did nothing and refused to get Meyers help. That incident "messed [his] lungs up" and made him unable to breathe when tested on some unspecified date by a doctor. (Day 1 Tr. at 229.)

---

[13] Meyers offered conflicting accounts about where the officers were. On cross-examination, he stated that the officers were in Dammones's empty cell (Cell D-209) when they deployed the gas and used a shared vent between the cells to get the gas to Meyers.

f.  *Claim 11: Defendant Harris cut Meyers's left arm on May 31, 2019, and thereafter, guards refused him treatment*

Meyers testified that on May 31, 2019, defendant Harris, an institutional investigator, came to his cell to deliver his legal mail.  Harris opened up the tray slot, shoved the papers in the tray slot, and cut Meyers's arm open, although Meyers did not know what was used.  Meyers claimed that he reported the injury to Harris and to others, but no one would assist him or get him medical assistance.

g.  *Claim 12: Medical personnel have repeatedly failed to treat him for various ailments[14]*

In his complaints, Meyers claimed that medical personal at WRSP have failed to treat him for his head injuries, severe chest pains, injuries to his ribs, shoulders, and testicles, nine gunshot wounds, stomach cancer, poisonings, and bedsores.[15]  His testimony, however, made clear that many of these ailments occurred years before.  The bullet wounds resulted from him being shot in 1990, 2004, and 2005, and a car accident that resulted in him breaking his neck and suffering hip, leg, and feet injuries occurred in 2005.  His testicle injuries and rib injuries occurred while he was housed at ROSP.  Specifically, he alleged that his testicles were injured on three different occasions when a guard threw a milk bag or opened Meyers' tray slot into him, and his ribs were broken when ROSP officers fell on him while trying to get him onto a machine that performs an anal scan for contraband.

He testified that he has stomach cancer and that he is being poisoned by the food, water,

---

[14]  Dr. Mullins, a prison physician who had treated Meyers on a number of occasions and was familiar with his medical complaints and records, credibly testified that many of Meyers's allegations concerning his ailments were simply false.  Dr. Mullins's testimony is discussed below.

[15]  As discussed *supra* at note 3, another judge of this court has also previously evaluated claims of imminent danger, some of which involved an alleged failure to treat him for stomach cancer and bedsores.  She found that Meyers had not presented credible information that he was suffering from stomach cancer, nor any medical evidence that he suffered from any physical or mental health ailment that required treatment at the time he filed his complaints.  Similarly, that judge found that the evidence did not support his claim about being poisoned with toxic paint.  (Report 5, 42, 44–45,  Case No. 7:18cv485, Dkt. No. 109.)

and paint in his cell.  He stated that medical personnel have refused to treat him for the cancer or poisoning.  He insisted that he had bleeding bedsores that were "painful all over [his] body." (Day 1 Tr. at 193.)  He stated that the doctors and nurses keep saying he does not have them, but he knows he does.

Although Meyers repeatedly stated that the medical department has refused to treat him, including refusing to treat his "blindness," he admitted that he was seen in the WRSP medical unit six times between February 2019 and December 2019, for both his bedsores and for problems with his eyes.  He also admitted that he has received chronic care through the medical department for his high blood pressure.[16]

### 2.  Meyers' Inmate Witnesses

#### a.  *Christopher Dammones*[17]

Christopher Dammones was housed in D-2 pod for part of the time that Meyers was there and had the opportunity to observe at least some of Meyers's interactions with correctional officers and others.  He testified that his cell was directly next to Meyers's cell on July 18, 2019, through August 27, 2019.  On cross-examination, Dammones testified that while in a restricted housing unit, an inmate cannot be in physical contact with other inmates.  An inmate in restricted

---

[16]  Meyers also raised at the hearing that he was given "narcotics" "without his consent."  (Day 1 Tr. at 199.)  Specifically, he stated that he was given Motrin and the "narcotic," Elavil.  (Day 1 Tr. at 199–200.)  He also raised an issue concerning being prescribed Motrin, which he claimed that he was allergic to.  Part of Dr. Mullins's testimony was devoted to this, too, and I find that Dr. Mullins's testimony was credible concerning what was prescribed and what Meyers is actually allergic to.  Furthermore, the only adverse reaction Meyers reported was that those drugs "aggravate[ed]" his "cancer . . . and stomach diseases."  (Day 1 Tr. at 200.)  Because I find Dr. Mullins testimony credible that Meyers does not have cancer or stomach disease, it is not necessary to address this claim further because it does not state a claim of "serious physical injury."

[17]  Much of Dammones's testimony elicited by Meyers did not relate to any threat *to Meyers*.  Instead, Meyers asked a lot of questions about interactions between Dammones and defendants or other correctional officers.  In testifying about the August 27, 2019 incident in which guards were trying to move him from his segregation cell to a step-down program, Dammones said that guards told him that if he would stop listening to Meyers, he wouldn't be "going through that."  (Day 1 Tr. at 28.)  Meyers argues that this shows that guards are trying to harm Dammones and him to stop them from talking about Luther Early's death.

housing engages in recreation in a cage by himself, although there are other inmates he can talk to if they are in an adjacent cage.  He also takes his food in his cell, rather than in an open area with other inmates.  When participating in "pod recreation" instead of in the recreation cages, he is strapped down and locked down in handcuffs that are attached to the table.  Dammones also testified that if an inmate is not in his cell, in his recreation cage, or chained to his chair for pod recreation, then he is restrained and escorted by guards.

Dammones also testified about the inmate who works in the pod, referred to by several names during the hearing including a pod worker.  This individual performs tasks in the pod like cleaning showers, helping the officers pass out meal trays, and sweeping the pod, and he is not in restraints while working.  In D-2 pod, the pod worker is Teddy Strouth.  Dammones testified that Strouth had access to a closet beside Meyers's cell, which contained cleaning chemicals, and testified that when he is cleaning in the pod, Strouth is not supervised.  Dammones also testified that at times when Strouth is assisting in handing out trays, the officer who is with him has his back to Strouth.  Meyers suggested that Strouth therefore had the opportunity to put hazardous substances in Meyers's food.

Dammones believed his and Meyers's meal trays or drinks were contaminated, but Dammones also admitted that he had never seen any guard tamper with anyone's food.  Dammones complained, though,  that guards wore the same black gloves for supervising inmates in the shower and at recreation that they then used to serve food, which he called cross-contamination.  He also saw fingerprints in his food.  He also said that he once found dip or snuff—the residue from chewing tobacco—in his food and he has "smelled cleaning supplies" in his food.  (Day 1 Tr. at 76.)  He "actually got kind of sick one time, sweating" from the food.  (Day 1 Tr. at 76.)

16

Dammones also testified that on one occasion, Dammones told Meyers not to take drinks from the food trays, and Strouth said, "I'm going to start spitting in the trays, then." (Day 1 Tr. at 67.) Strouth never said he did spit in any tray, though. Another time, Dammones confronted defendant Cox about Cox "doing stuff" to Dammones's food. (Day 1 Tr. at 37, 67.) In response, Cox denied doing anything to Dammones's food, but added that if he were going to do that to anybody, he was "going to do it to Meyers." (Day 1 Tr. at 67.) Notably, Dammones testified that he never saw Cox put anything in any of the food trays and that Cox did not say he had ever put anything in Meyers's food.

Dammones testified about the pod chairs, too. He explained that, on August 8, 2019, the inmates were chained down to the chairs for approximately an hour and the chairs severely restricted their movement. Dammones testified that Meyers did not come out to rec on that day and that guards entered Meyers's cell, after he said he could not come out backwards because he was in a wheelchair and could not turn it like that. Dammones said that defendants Cox and Lieutenant Light had rubber hammers or rubber mallets at the time they entered the cell. Dammones also testified that, on July 22, 2019, he heard defendant Ely go to Meyers's cell, refer to Meyers's court cases, say that he was not sacred of Meyers, and then tell Meyers that he would kill him.

Dammones further testified that Cox refused to take Meyers's emergency grievance in which Meyers was complaining that he was suffering from stomach cancer.

Dammones also echoed much of Meyers's story about Luther Early. He stated that Early was having a stroke or seizure and the nurse came to his cell, noticed he was unresponsive, said, "To hell with you," and left. (Day 1 Tr. at 40.) Early's death is largely irrelevant to claims that Meyers was in imminent danger. But Meyers contends that, as a result of their witnessing and

reporting the event, he and Dammones were then targeted by guards.  This targeting resulted in

Dammones being extracted from his cell on August 27, 2019, and the alleged attempt to kill

Meyers by spraying gas in his cell vent on the same date.  Dammones also testified that, after

they extracted him from his cell, he heard one of the guards say "Meyers, you're the next one

we're going to kill."  (Day 2 Tr. at 67.)

I find much of Dammones' testimony to be non-credible.  Throughout his testimony,

Meyers was leading and suggestive in his questioning, and at least some of Dammones's

assertions regarding his cell extraction are not supported by the handheld video of the

extraction.[18]  In that video, Dammones was given repeated directives to come to the cell door so

he could be handcuffed, and the force used as shown in the video did not appear to be excessive

or particularly violent.  (Defs.' Ex. 1.)  Certainly, it does not reflect officers "beating Dammones

nearly to death," as claimed by Meyers.  The video was also telling in that, throughout the

recording, a voice identified by witness Ely as Meyers's can be heard yelling loudly, swearing,

and repeatedly telling Dammones not to "cuff up" and not to cooperate with the officers.

Even if I were to credit all of Dammones's testimony, though, it shows only that some

guards made verbal threats to Meyers and that there was occasionally a contaminant in the food

trays.  Notably, Dammones did not testify that either he or Meyers ever suffered a serious

physical injury as a result, or that Meyers was imminently likely to.

    *b.  Bobby Richardson*

Meyers also called as a witness Bobby Richardson, another inmate.  Richardson said he

was housed in cell the D-2 pod with Meyers from November 2018 (when Meyers arrived) until

---

[18] After the video was shown, Meyers objected to the introduction of the video and alleged that the video had been tampered with and that certain portions had been cut.  I saw no evidence that the video had been tampered with in any way.

Richardson was sent to general population in April 2019. He then returned back to the D-2 pod at some later point, but he could not recall exactly when. He believed that the water in the D-2 pod was contaminated and that the food had something in it, because he would feel sick after drinking it and he lost weight while he was housed there. On cross-examination, he said he did not see anyone contaminate the food, but that the food "doesn't give [him] nutrition" to "make [him] grow," so he believes it was contaminated. (Day 1 Tr. at 104–05.) He stated that he was given sour milk once and that he believed he received "marked" trays that were marked so that they would be given to specific inmates to make them sick. He also testified about his cell being so cold that he had to put stuff around his head, walk around in his shoes, and wrap blankets about him to keep warm. Richardson also testified that he heard Meyers ask for medical care and be denied it.

      *c.  Linwood Mathias*

Meyers next called Linwood Mathias, who testified that he was housed in D-2 pod from approximately October 4, 2019, until either October 18 or 24, 2019. As relevant to Meyers's allegations of imminent danger, Mathias said that on October 16, 2019, he saw Meyers's food tray and that it had trash in it. Mathias also testified that he had seen the pod worker "spit[] in" "people's drinks." (Day 1 Tr. at 129–30.) Mathias explained that the pod worker did not wear a hair net or anything on his mouth when serving trays, possibly suggesting that the "spitting" was accidental. In response to a leading question by Meyers, though, Mathias said that the pod worker "sabotages" the meal trays when the officers' backs are turned. (Day 1 Tr. at 130.) Mathias never elaborated on what the pod worker did. In any event, Mathias admitted that none of the meals or drinks in D-2 pod ever made him ill or caused him pain.

Mathias also testified that the pod worker is not in handcuffs or leg restraints when

working. Also, he heard Meyers request medical care for his back, legs, and headaches, and unspecified correctional officers or medical staff just told Meyers that he would be all right.[19] He then testified, though, that he was with Meyers once in the medical unit.  So, clearly Mathias knew Meyers received some treatment.  Lastly, Mathias said that, on the same day that Meyers received the tray with the trash, Meyers complained repeatedly.  Mathias then heard a correctional officer say to Meyers, "I'm gonna kick your ass if you keep talking about the tray." (Day 1 Tr. at 127.)

### 3.  Defendants' Witnesses

#### a.  *Joseph Shawn Ely*

Defendants' first witness was Joseph Shawn Ely, the unit manager of the D-2 pod since January 2019 and an employee at WRSP since 2006.  Ely confirmed Meyers's testimony that Meyers had been housed only in restricted housing units, and he described the security arrangements in those units.  He testified that any time a prisoner is removed from his cell for any reason (a shakedown, to go to shower or recreation, to go to medical or attend a disciplinary hearing), he is escorted in restraints and correctional staff accompany him.

Ely testified that, at some point Meyers had qualified to be released to general population and had been approved by the institutional classification authority ("ICA") board for release to general population, but he refused to go.  Ely said that Meyers was given the opportunity to participate in the ICA hearings and the meeting was held in front of his cell because he could not physically go upstairs to where they were normally held.  But Meyers did not contribute anything to the discussion.[20]  Ely denied ever trying to put any inmate in general population for the

---

[19]   Both Dammones and Richardson also testified that Meyers had told them he had stomach cancer and needed medical treatment.

[20]   Ely testified that the "majority of the time" that Mr. Meyers had spoken to Ely in the building, "it's been vulgar language" and Meyers had spoken that way "with me on everything, ICAs included."

purpose of retaliating or endangering him.  He explained that VDOC would much rather have inmates be held in general population because it gives the inmate a chance to get ready to be released and live with others, ultimately reducing recidivism.  But that if an offender refused to go to general population, he would not be physically forced to do so; he would be given a disciplinary charge for refusing to obey an order and would be permitted to remain in restrictive housing.  That is what occurred with Meyers, except that the disciplinary charge was not pursued because Meyers had previously received one at ROSP for the same offense.

Regarding the alleged threats by Ely and other staff, Ely denied threatening Meyers and said he was not aware of other officers threatening Meyers. He also testified that he has not orchestrated or encouraged anyone to retaliate against Meyers.

Ely also testified about inmate Strouth, the pod worker.  Strouth does not wear restraints or handcuffs while working, but there is never a time when he is cleaning or assisting with meals without an officer present.  Additionally, whenever the inmate worker is in a restricted housing unit working, all the offenders are confined to their cells.  According to Ely, the door to the closet with cleaning chemicals is locked by security staff and Strouth does not have a key and would not be able to get or use those supplies without supervision.

Ely was one of the guards present when Dammones was extracted from his cell on August 27, 2019.  He stated that because OC gas was used in Dammones cell, it is possible that the smell of it could have made its way into Meyers's cell.  But he flatly denied that there was any other use of OC spray after Dammones's extraction and denied that any officer returned to harm Meyers or to dispense an entire cannister of gas, into a vent or otherwise.  He also testified that he walked right into Dammones's cell after the gas was used and he coughed, but that neither he nor the other officers had to seek any medical attention for that exposure.

21

With regard to some of the cell conditions as alleged by Meyers or the inmate witnesses, Ely testified that the temperature is kept at right around 70 degrees in the pod and that WRSP was built around 1999, so he did not believe there was lead paint anywhere in the facility. He also testified that he had not noticed any excessive amount of paint peeling or any other substances coming from the wall or ceiling in D-210 or elsewhere. He testified that Meyers was offered shower and recreation like every other offender. To Ely's knowledge, however, Meyers had declined to shower or go to recreation.

### b. *David Christopher Harris*

David Christopher Harris, who has been an intel officer at WRSP for five or six years, testified next. Harris is the officer accused of cutting Meyers's arm while delivering mail, an allegation that Harris flatly denied. Harris stated that he delivered mail to Meyers on May 31, 2019, but "never cut Mr. Meyers, never harmed Mr. Meyers, or any such thing." (Day 2 Tr. at 110.)

Harris's duties are to monitor gang activity, to conduct investigations related to fights, drugs, and PREA investigations, and to collect evidence and conduct drug testing. Harris confirmed that Meyers had been in restrictive housing units the whole time he has been at WRSP, first in D-1 pod and then in D-2. Meyers also spent some time in the medical unit, but medical units are under the same guidelines as a restrictive housing unit in terms of freedom of movement for the inmates, escorts and restraints.

Harris testified that he had no knowledge about whether Meyers had ever been an informant or given testimony for law enforcement, nor did he have any knowledge that staff or inmates were sharing such information about Meyers. Harris testified that, in order to obtain a keep-separate order from another offender, Meyers would have to do more than just list the name

22

of another inmate on an enemy summary form.  He would have to explain why they should be kept separate, for example that he had been in an altercation with another offender.  The intel unit would not start an investigation into a keep separate request without any kind of factual basis.  He also testified that, as far as he knew, Meyers had never provided a reason for naming another WRSP inmate as an enemy.  He also testified that he had no knowledge of any violence committed on Meyers wile at WRSP.

In responding to Meyers's questions, Harris indicated that Meyers has filed numerous informal complaints and grievances and that he believed there were six current PREA investigations initiated by Mr. Meyers, some of which were still being investigated.  To date, however, Harris had not determined that any of Meyers's complaints were founded.

### c. *Benjamin Young*

Benjamin Young, Meyers's case management counselor at WRSP, testified next.  He stated that on several occasions Meyers had provided names of inmates from whom he wanted to be kept separate.  But Young noted that Meyers repeatedly failed to make specific claims and did not provide any reason for listing those inmates as his enemies.  Young explained, much as Harris did,  that Meyers had to attend or participate in an ICA meeting or multi-disciplinary team meeting or otherwise give some information about why he believed he was at risk from contact with a specific inmate.  Young also testified that, of the names he knew that Meyers had listed, none of them had a reputation of being predatory or violent toward other offenders.  Young testified that he took the information given by Meyers to his multi-disciplinary team members, who apparently decided that there was no basis for placing those individuals on a keep-separate list for Meyers, absent additional information, which Meyers refused to provide.[21]

---

[21]  Meyers tried to impeach Young's credibility by showing that Meyers had requested enemy summary forms from Young and mentioned that in a grievance to which Young responded, even though Young had not

*d.  Nurse Tina Townsend*

Tina Townsend is a registered nurse who works at WRSP.  She testified concerning Meyers's medical history and claims.  Introduced through Townsend were Meyers's medical records for his time at WRSP.  (Defs.' Ex. 2.)  In reviewing those records, Townsend testified that Meyers receives chronic care for asthma and hypertension every six months, although he refused his visit in May 2019.  His chronic conditions have been stable while at WRSP.  He also has a skin check done monthly by a nurse to monitor for bedsores.  When asked whether staff had ever observed any significant bedsores during those checks, she said no.  Moreover, if staff had observed bed sores, Meyers would have received wound care, follow-up, and assessment.

She testified that he had reported a head injury in February 2019, but that the medical observations did not support any actual head injury.  He also has repeatedly complained of chest pains.  Each time he does so, the complaint automatically results in an EKG getting done, so a number of EKGs, all of which were normal, were in his records.  She testified that his records contained several allegations by Meyers that he had suffered an injury that could cause pain, but there was nothing and no medical evidence to support any of them.  She also denied that he had suffered any significant injury or illness while at WRSP.

She testified that the medical department did not believe Meyers required any ongoing treatment for the gunshot wounds and did not provide treatment for stomach cancer because Meyers did not have stomach cancer.

Nurse Townsend testified that Meyers had not been refused medical treatment, and she was not aware of any mistreatment of Meyers by medical staff.  She also noted that Meyers was

---

recalled that on his direct examination.  But even if it is true that Young denied Meyers enemy summary forms, that does not translate into a risk of imminent harm to Meyers, who is housed in restricted housing and is fully protected from other inmates.

argumentative with the staff on several occasions, and that there have been times when he has refused treatment. She also testified that if an individual arrived to medical and had feces and urine on him, he would be given the opportunity to clean himself or, if he could not do it himself, medical staff would assist. She stated that the staff "would not leave anyone like that."[22] (Day 2 Tr. at 208.)

      *e.  Dr. Mullins*

Dr. Mullins, who has treated Meyers and is a physician at WRSP, refuted many of Meyers's allegations of illness and injury. Mullins testified that Meyers does not have any significant heart disease and that he received EKGs only because he complained of chest pain. Mullins testified that Meyers has one bullet lodged in the right lung and some shrapnel in his left hand, but that the bullet is not symptomatic and that it is "extremely unlikely" Meyers would have any problems with it. (Day 2 Tr. at 212.) In fact, Dr. Mullins stated that the risk of surgery to remove that bullet far exceeds any risk of leaving it where it is. Dr. Mullins denied Meyers's allegation that there are four bullets lodged in his body, and thus implicitly denied Meyers's allegation that radiology staff falsified his x-rays to show that there in only one bullet in him.

With regard to Meyers's allegation that he has stomach cancer, Meyers had an upper GI endoscopy done in 2017, which showed some mild inflammation, but no cancer. Dr. Mullins noted that if Meyers had been suffering from stomach cancer for years as he claimed, his blood count would be low and he would have lost a lot of weight, neither of which occurred. He also would have had "almost unbearable stomach pain." (Day 2 Tr. at 213.) Thus, Dr. Mullins testified that he saw no indication that Meyers had stomach cancer.

---

[22] As to his claim about improperly presented medicine, Townsend confirmed that Meyers's transfer form when he first arrived at WRSP listed "Motrin, NSAIDs, and Naproxen" under "Known Allergies" and that he had been prescribed Mobic while at WRSP. *See also supra* note 16.

Dr. Mullins also testified that there were no injuries to Meyers's spine or lower body that would affect his day-to-day functioning and x-rays of his neck, entire spine, pelvis, and legs are all normal.  He also noted that he had seen no signs of wasting or atrophy of the muscles in Meyers's legs and that staff at Red Onion had worked with Meyers for months to get him to walk, but he was uncooperative and made "no effort to help" himself.  (Day 2 Tr. at 216.)  Dr. Mullins also testified that he had not observed any injuries to Mr. Meyers's spine or lower body that would affect his day-to-day functioning, effectively implying that there is no medical reason why Meyers could not walk.  (Day 2 Tr. at 213–14.)

Dr. Mullins also explained that five or six different nurses examined Meyers for bedsores and noted that he had none.

Dr. Mullins stated that he evaluated Meyers following incidents of alleged head injuries. He said there was little, if any, soft tissue damage and only a little red mark above his right eye was observed by the nurse.  When Dr. Mullins saw him later, there was nothing.  Dr. Smith saw Meyers two days after his fall and even ordered a skull x-ray, but he saw no evidence of any intracranial injury or neurological effect, and the bone was fine.

Lastly, as to Meyers's claim about his prescriptions,[23] Dr. Mullins explained that he had prescribed him Motrin, but after Meyers raised an issue of a possible allergy to Motrin, Dr. Smith and Meyers discussed it and determined that Meyers could take nonsteroidal anti-inflammatory drugs (NSAIDs).  Dr. Mullins stated that if a person has an allergy to one NSAID, he will be allergic to the whole class of drugs, and Meyers had been taking Mobic, which is also and NSAID, without incident since his arrival at WRSP.  Meyers also failed to ever report an adverse reaction from the Motrin.

---

[23] *See supra* note 16.

26

#### 4. Documentary Evidence

Five exhibits were introduced through witnesses: Plaintiff's Ex. 1, a "Supplemental

Response to Court Order," from 7:16-cv-573; Plaintiff's Ex. 2, a group of grievance documents

submitted by Meyers, which were admitted for the purpose of showing notice; Plaintiff's Ex. 3,

an informal complaint filed by Meyers dated July 23, 2019; Defendants' Ex. 1, a video of the cell

extraction of Dammones on August 27, 2019; and Defendants' Ex. 2, 88 pages of medical

records from Meyers's time at WRSP.

## II. DISCUSSION

As noted, Meyers has had at least three previous complaints dismissed as frivolous. The

Prison Litigation Reform Act ("PLRA") therefore prohibits him from proceeding with any new

case unless he pays the filing fee or shows that he is under "imminent danger of serious physical

injury." 28 U.S.C. § 1915(g). To make that showing, Meyers must show that the "conduct

complained of threatens continuing or future injury," not just that he "deserves a remedy for past

misconduct." *Johnson v. Warner*, 200 F. App'x 270, 272 (4th Cir. 20006) (quoting *Martin v.

Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003)).

"Vague, speculative, or conclusory allegations are insufficient to invoke the exception of

§ 1915(g); rather, the inmate must make 'specific fact allegations of ongoing serious physical

injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical

injury.'" *Johnson*, 200 F. App'x at 272 (quoting *Martin*, 319 F.3d at 1050); *see also Shepherd v.

Annucci*, 921 F.3d 89, 97 (2d Cir. 2019) (affirming district court's conclusion that claim of

imminent danger was "without foundation" when the prisoner's explanation was "both circular

and completely conclusory"). Similarly, leave to proceed *ifp* may be denied when the prisoner's

claims "are conclusory or ridiculous, or are clearly baseless (*i.e.*, are fantastic or delusional and

rise to the level of irrational or wholly incredible).'' *Vandiver v. Prison Health Servs., Inc.*, 727
F.3d 580, 585 (6th Cir. 2013).

Where a plaintiff's claims of imminent danger are contested, then an evidentiary hearing
is an appropriate way to resolve that issue, although the inquiry should be a ''narrow'' one. *Smith
v. Wang*, 452 F. App'x 292, 293 (4th Cir. 2011); *Shepherd*, 921 F.3d at 94 (''All of our sister
circuits to have confronted this question have held that district courts—upon challenge by a
defendant—may conduct a narrow evidentiary inquiry into the prisoner-litigant's fear of
imminent danger.'').[24]  The need for such a hearing may be particularly pressing where, as here, a
plaintiff's prior (and similar) accusations of imminent danger have been found to lack credibility.

Before turning to Meyers's specific claims of imminent harm, it is worth noting that
Meyers has been claiming in court filings for years that numerous people at each place he has
been incarcerated (both inmates and correctional officers) have been trying to murder him.
During the entire time he was at WRSP, which was over a year at the time of the evidentiary
hearing, he has been sufficiently protected so that he has not suffered any significant injury,
according to the credible medical personnel at WRSP.

Turning to Meyers's twelve categories of imminent harm, I first note that many of
Meyers's claims of imminent danger fall within the category of ''fantastic,'' ''delusional,'' or
''wholly incredible.''  In particular, he presented no evidence, and his medical records disclose
none, that he was ever found to be suffering from symptoms of ingesting any toxic or harmful
substance or hazardous toxic paint.  Likewise, I find no evidence that Meyers was ever
diagnosed with stomach cancer; he bases that assertion simply on his own self-diagnosis.

---

[24]  Here, the defendants have not yet been served with the complaint and so have not yet formally contested
Meyers's allegations.  But the presiding judge made a provisional determination that allegations in Meyers's
complaints set forth a potentially valid claim of imminent danger and gave OAG counsel (who would represent
many of the defendants) an opportunity to oppose the allegations, which OAG has done.

Indeed, Dr. Mullins testified that Meyers did not have stomach cancer, and he cogently explained the symptoms that would accompany stomach cancer, none of which Meyers has exhibited. Clearly, a failure to treat non-existent cancer does not give rise to a claim of imminent danger of serious physical injury.

Meyers's claims of significant head injuries and bedsores "all over his body," also are flatly contradicted by his medical records and the testimony of Nurse Townsend and Dr. Mullins. Both of them noted that he was seen for his complaints of head injuries on several of the occasions he references and that his body was inspected—by a number of different nurses—for bedsores, but that there was no objective medical evidence that he had suffered any significant head injury or that he had bedsores.

Meyers does not dispute what is in his records, but he argues that the medical staff was part of the overarching conspiracy he believes exists and that they "meant to kill" him. To account for the records themselves, then, Meyers contends that various medical personnel were either falsifying his records or refusing to note his ailments in his medical records so that he would continue to suffer. His suggestion—without any corroborating evidence—that numerous personnel on the medical staff have purposefully falsified his medical records, including radiological records, and have observed, but refused to treat, stomach cancer, poisonings, bedsores, and significant head injuries, is wholly incredible. Likewise, his contention that the medical department has not documented his cancer, bedsores, or cardiac arrests he claims to have had because they want him to die, is simply not believable. He offers no motive or any other explanation for why the medical staff want him dead or suffering. Moreover, the testimony of Nurse Townsend and Dr. Mullins reflected clear and repeated efforts to treat Meyers, as do his medical records.

Thus, I credit the objective observations listed in the medical records and testified to by Nurse Townsend and Dr. Mullins, which establish that Meyers has not suffered from serious physical injury while housed at WRSP, and he has not sustained any serious head injury or poisoning or other exposure to hazardous materials. Accordingly, I conclude that Meyers has not stated a claim of imminent danger of serious physical injury in Claim 5 (allegations of head injuries following falls), Claim 6 (being forced to eat, drink, and ingest hazardous substances), Claim 7 (oven cleaner, glass, and substances in his food trays), and Claim 12 (failure to provide medical treatment).

I turn next to his claims involving alleged threats or attempts to murder him by other inmates. Critically, although he theorizes and speculates about why so many other inmates want to murder him, he does not allege that he was ever assaulted by any inmate while at WRSP. Meyers may sincerely believe that "***hundreds***" of inmates and VDOC employees are trying to murder him, but the evidence presented at the hearing simply does not bear that out; instead, it appears that his belief is properly categorized as "delusional." Most notably, Meyers admitted that he has not been assaulted by any inmate while at WRSP or close in time to his transfer to WRSP. He also admitted that he has been housed in a restricted housing unit for the entirety of his time at WRSP. His custody status is significant because inmates in restricted housing have little to no opportunity for physical contact with any other inmates. The conditions described by the witnesses—both guards and inmates—concerning the movement of prisoners and possible interactions between prisoners—which include the prisoners being restrained whenever outside of their cells—make it extremely unlikely that any such assault could ever occur. Given his custody status, in particular, then, Meyers' allegations of threats are insufficient to show that he is in imminent danger. *See Mitchell v. Federal Bur. of Prisons*, 587 F.3d 415, 421 (D.C. Cir.

2009) (concluding no *imminent* danger existed where prisoner had suffered a violent assault seventeen months before filing his action and alleged that he was a known "snitch" and was being housed in a dangerous prison known for murder and assaults on snitches); *Cloud v. Stotts*, 455 F. App'x 534, 535 (5th Cir. 2011) ("[P]laintiff's bare assertions that he has been threatened at unspecified dates in the past by inmates who have beaten other inmates at the direction of one of the defendants does not rise to the level of a showing that he was in 'imminent danger of serious physical injury' when he filed his complaint.").

Indeed, with regard to the two incidents that Meyers testified about in which he felt threatened—the incident with Lytton and the incident with Shoemaker—Meyers was not assaulted and he suffered no injury. The fact that he could identify only two instances in more than a year where there had even been the possibility (at least according to Meyers) of an assault by another inmate, shows that no harm was imminent at the time he filed these lawsuits. Similarly, his claims that Strouth has the capability to firebomb his cell is not supported by any credible evidence. First of all, Ely testified that a pod worker is not given free access to the chemical closet, but is supervised when obtaining and using the chemicals. I find this testimony credible. But even if I credited the inmates' testimony that there are occasions when a pod worker is occasionally left unsupervised in the pod, Meyers has not identified any good reason why Strouth would want to do him harm, that Strouth is violent, or that Strouth would risk losing his inmate job just to firebomb Meyers's cell. Moreover, Meyers did not identify what chemicals are in that closet or how they could be used to create a firebomb that Strouth could throw into his cell. For all of these reasons, any claims related to other inmates trying to kill him (Claims 1, 2 and 3), do not show an imminent danger of serious physical injury.

Turning to the threats, alleged assaults, and attempted murders by VDOC officers, these

could be—in a vacuum—more concerning, because officers at least have physical access to
Meyers while he is in a restricted housing unit, unlike other inmates.  But Meyers's allegations
that so many VDOC employees are taking so many different types of actions, all in an attempt to
kill him, especially when coupled with Meyers's complete lack of credibility, simply cannot be
believed.  This is especially true when the testimony of some of the officers undermines the
factual basis of his claims.  I specifically find that the two events alleged by Meyers did not
occur.

The first allegation of physical harm by a guard, in which Meyers alleges that Harris cut
his arm while delivering mail, finds no support in the medical records and was credibly denied
by Harris.  Especially given Meyers's utter lack of credibility, I cannot credit this allegation.
Moreover, Meyers has not offered any evidence that Harris is likely to commit another assault
against him, other than his wild speculation about all the guards being part of a single conspiracy
to kill him and other inmates.  Meyers did not allege that the same defendant had engaged in the
same behavior or that he had been injured since.  As the Fourth Circuit has recognized, "the
requisite imminent danger of serious physical injury must exist at the time the complaint or the
appeal is filed. . . . Moreover, the exception focuses on the risk that the conduct complained of
threatens continuing or future injury, not on whether the inmate deserves a remedy for past
misconduct."  *Smith v. Wang*, 370 F. App'x 377, 378 (4th Cir. 2010) (citation omitted); *Cosby v.
Gray*, 124 F. App'x 595, 596–97 (10th Cir. 2005) (concluding no imminent danger where
prisoner waited four months from the time of the alleged injury to file his complaint and he did
not allege that those actions were likely to reoccur).

Based on all the testimony, I also find Meyers's assertion that officers tried to kill him by
venting gas into his cell to be without merit.  Most importantly, Meyers's description of the gas

incident was denied by at least one of the officers involved—Ely—and no corroborating

evidence suggests that Meyers suffered any injury from allegedly inhaling any gas.  Again, his

suggestion that a group of guards acted in concert to spray gas into his cell to try to kill him,

especially considering his credibility generally, is not believable.

Regarding Meyers's claim that some defendants tried to "force" him into general

population, he admits that he was never moved to general population and does not state that such

a transfer has been presented again.  Moreover, Ely testified that no inmate would be forcibly

moved to general population from a restricted housing unit.  So Meyers faces no risk of any

imminent return to general population if he does not want to go there.

With regard to the allegations that defendants took steps to ensure he would fall (such as

giving him the wrong glasses or leaving papers strewn on his cell floor), he again presented no

medical evidence that he suffered a significant head injury from any fall while at WRSP.

Despite his allegations of a serious head injury, he was observed and treated by medical

personnel after at least some of those incidents, and no observation suggests he had a significant

injury.  Moreover, to the extent any of those falls were avoidable, they do not give rise to an

imminent danger claim.  *Cf. Shepherd*, 921 F.3d at 96–97 (affirming district court's conclusion

that no imminent danger resulted from prisoner's alleged frequent falls due to having to walk

long distances where prisoner had access to a wheelchair and ambulatory aids, but failed to use

them because they "caused him discomfort").

I thus conclude that Meyers has failed to present credible allegations of imminent harm as

to the following claims:  Claim 1 (inciting other inmates to murder him), Claim 3 ("unceasing

PREA retaliation and sexual abuses and . . . attempted murders"), Claim 4 (trying to force him

into general population to kill him), Claim 5 (falls caused by defendants resulting in head

injuries), Claim 10 (guards pumping gas into his cell), and Claim 11 (Harris cutting his arm).

As to Claim 8—Meyers's claim that he has been denied shower and rec for more than one year—it is contradicted by the credible testimony.  As Ely credibly testified, all inmates in the D-2 pod are offered the opportunity for showering and recreation.  Meyers had repeatedly refused both.  As to the alleged denials of Meyers's requests to shower by medical department personnel, Nurse Townsend credibly testified that if an inmate appeared in the medical unit in the conditions described by Meyers, he would be permitted to shower and be assisted, if necessary.  Meyers's assertion that all the guards and all of the medical personnel he encountered over the period of more than a year have all refused him the opportunity to take showers or engage in recreation is not credible.  Thus, I find no imminent harm as to Claim 8.

Lastly, regarding his allegation in Claim 9 concerning the chairs in the pod designed to torture  him, he presented no evidence to show that he was injured in any way by those chairs. He did not state specifically that he even sat in those chairs, and his testimony suggested that he simply refused to attend recreation.  Moreover, he did not identify any injuries resulting from sitting in the chairs, and his medical records do not reflect any injuries resulting from his placement in the chairs.  In any event, some minimal discomfort encountered occasionally does not equate to imminent danger of serious physical harm.  *Cf. Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir. 2003) (working in inclement weather twice is not imminent danger).

### III.    CONCLUSION

I recommend that the district court find, based on the foregoing analysis, that Meyers was not under imminent danger of serious physical injury at the time he filed any of these complaints. I further recommend that the district court deny Meyers's motions to proceed *in forma pauperis,* dismiss these actions without prejudice, and deny all pending motions as moot.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: February 21, 2020.

Joel C. Hoppe
United States Magistrate Judge